WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Cory Lane Tower, | ) | CIV 09-1186-PHX-MHM (MHB) |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Charles L. Ryan, et al., | ) | |
| Respondents. | ) | |

TO THE HONORABLE MARY H. MURGUIA, UNITED STATES DISTRICT JUDGE:

Petitioner Cory Lane Tower, who is represented by attorneys Jess A. Lorona and Gregory E. McClure, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) On December 11, 2009, Respondents filed an Answer and, on February 8, 2010, Petitioner filed a Reply. (Docs. 10, 15.)

**BACKGROUND**

On July 17, 2005, officers responded to a 9-1-1 call that had been placed around 3:30 p.m., in reference to a shooting. (Doc. 1, Exh. E, attach. A at 5.) Officers from the Mesa Police Department arrived and spoke with Lisa Tower, the wife of Petitioner. (Doc. 1, Exh. E, attach. A at 5-6.) Lisa stated that she and Petitioner were in the process of divorcing, and had met at about 3:00 p.m. that day to exchange custody of their three-year-old son. (Doc. 1, Exh. E, attach. A at 6.) During the exchange, she noticed Petitioner was crying and "fairly emotional," and "was hugging [their child] and kissing him, and she thought that was a little abnormal." (Doc. 1, Exh. E, attach. A at 6-7.) After giving Petitioner their child, Lisa was

returning to her home when she received a text message from Petitioner, informing her that he had some of her mail; she again met with Petitioner to retrieve her mail, and then continued to her residence. (Doc. 1, Exh. E, attach. A at 7.)

When she arrived home, she saw her boyfriend, Timothy Zaragoza, lying on the floor in the bedroom, using his laptop computer. (Doc. 1, Exh. E, attach. A at 7.) Lisa joined him on the floor, and a few moments later they heard the door slam, prompting Timothy to ask "whose that"; Lisa responded that she "hope[d] it [was] the landlord." (Doc. 1, Exh. E, attach. A at 7.) The next thing Lisa heard "was a gunshot, and she turn[ed] over in time enough to see [Petitioner] shoot Timothy one more time in the back." (Doc. 1, Exh. E, attach. A at 7.) For "a period of time after the shooting," Petitioner "order[ed] Lisa's movements throughout the house" at gunpoint, and would not allow Lisa to "render any kind of aid" to Timothy, or let her "phone the police department." (Doc. 1, Exh. E, attach. A at 8.) Lisa thought she was going to be killed as well, and pleaded with Petitioner to not kill her, and to leave their child with her. (Doc. 1, Exh. E, attach. A at 8.)

Petitioner eventually wrapped the gun he had used to shoot Timothy in a blue shirt, and took it out of the house. (Doc. 1, Exh. E, attach. A at 8.) Petitioner gave their child (who had been left outside in his car seat when Petitioner entered Lisa's residence) to Lisa, and then left the residence. (Doc. 1, Exh. E, attach. A at 8.) Approximately two-and-a-half to three hours later, Petitioner turned himself in to the police. (Doc. 1, Exh. E, attach. A at 8.) The gun Petitioner had used to kill Timothy was later found in the trunk of Petitioner's vehicle, wrapped in a blue shirt. (Doc. 1, Exh. E, attach. A at 9.)

On July 27, 2005, Petitioner was indicted in Maricopa County Superior Court on one count of first degree murder, a class 1 dangerous felony,[1] one count of aggravated assault, a class 3 dangerous felony, and one count of burglary in the first degree, a class 3 felony. (Doc. 10, Exh. A.) On August 18, 2005, the State moved to amend the indictment to reflect

---

[1] The State alleged murder in the first degree committed with premeditation, or in the alternative, felony murder occurring in the course of Petitioner's commission of first degree burglary.

the burglary offense was a class 2 felony, and that it occurred in a residential structure. (Doc. 10, Exh. B.)

On October 11, 2006, Petitioner entered a plea of guilty to first degree murder, a class 1 dangerous felony, and aggravated assault, a class 3 dangerous felony. (Doc. 1, Exhs. A, B.) As part of the plea agreement, the parties stipulated that Petitioner would be sentenced to the Department of Corrections for a term of life with the possibility of parole after 25 calendar years, and that the court's sentence on the aggravated assault offense would run concurrently with the sentence for first degree murder. (Doc. 1, Exhs. A, B.)

Petitioner was, subsequently, sentenced to a term of life with the possibility of parole after 25 calendar years on the first degree murder charge and 10 years' imprisonment on the aggravated assault charge to run concurrently with the sentence for first degree murder. (Doc. 1, Exh. C.) Petitioner was awarded 490 days of presentence incarceration credit, and was ordered to pay restitution to the victim's family in the amount of $7,897.34. (Doc. 1, Exh. C.)

On July 16, 2007, Petitioner through counsel filed an amended petition for post-conviction relief raising the following issues:

> (1)     The recording of Petitioner's conversation with his parents without notice violated Petitioner's constitutional right to representation by counsel. (Doc. 1, Exh. E at 5-6.)
>
> (2)     Petitioner's Sixth and Fourteenth amendment right to effective assistance of counsel was denied. (Doc. 1, Exh. E at 6-10.)
>
> (3)     Petitioner's guilty plea was unlawfully induced. (Doc. 1, Exh. E at 10-11.)
>
> (4)     The court's failure to grant a continuance constituted a violation of Petitioner's right to due process of law. (Doc. 1, Exh. E at 12-13.)

The State filed its response to the petition, and Petitioner's counsel filed a reply to the State's response. (Doc. 10, Exhs. C, D.) On October 12, 2007, the trial court summarily dismissed the petition. (Doc. 1, Exh. F.)

On November 14, 2007, Petitioner's counsel filed a petition for review in the Arizona Court of Appeals, requesting review on the following issues:

1.     Whether the trial court abused its discretion in finding that there was no colorable claim for relief based on the recording of [Petitioner's] conversation with his parents without notice and after [Petitioner] had exercised his right to counsel.

2.     Whether the trial court abused its discretion in dismissing the Petition for Post-Conviction Relief where [Petitioner] had presented a colorable claim that his Sixth and Fourteenth Amendment right to effective assistance of counsel was denied.

3.     Whether the trial court abused its discretion in dismissing the Petition for Post-Conviction Relief where [Petitioner] had presented a colorable claim that his plea was unlawfully induced.

4.     Whether the trial court erred in dismissing the Petition for Post-Conviction Relief even though the court's failure to grant a continuance violated Petitioner's Right to Due Process of Law.

5.     Whether the trial court abused its discretion in dismissing Petitioner's Petition for Post-Conviction Relief in light of the above claims.

(Doc. 1, Exh. G.)  On June 3, 2008, the appellate court entered its order summarily denying review.  (Doc. 1, Exh. H.)

On June 2, 2009, Petitioner through counsel filed the instant Petition for Writ of Habeas Corpus.  (Doc. 1.)  Petitioner raises four grounds for relief:

(1)     Petitioner's right to representation by counsel was violated when his conversation with his parents was recorded without his knowledge (Doc. 1 at 4-6);

(2)     Petitioner was denied the right to effective assistance of counsel (Doc. 1 at 6-11);

(3)     Petitioner's guilty plea was unlawfully induced (Doc. 1 at 11-12); and

(4)     The trial court's denial of Petitioner's motion for a continuance violated Petitioner's right to due process (Doc. 1 at 12-14).

On December 11, 2009, Respondents filed an Answer and, on February 8, 2010, Petitioner filed a Reply.  (Docs. 10, 15.)

## DISCUSSION

In their Answer, Respondents contend that Grounds One through Four as set forth in Petitioner's habeas petition fail on the merits.  As such, Respondents request that the Court deny each of Petitioner's claims and dismiss the Petition for Writ of Habeas Corpus with prejudice.

Pursuant to the AEDPA[2], a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review).  "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ."  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 404-05.  "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable."  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

**A.    Ground One**

In Ground One, Petitioner alleges that his right to representation by counsel was violated when his conversation with his parents was recorded without his knowledge.

On July 17, 2005, Lisa Tower was interviewed by a detective with the Mesa Police Department at Police Headquarters, regarding the aggravated assault and murder charges pending against Petitioner; Detective Faulkner monitored the interview.  (Doc. 10, Exh. C, app. 1.)  After monitoring the interview, Detective Faulkner began his DVD and audio

---

[2] Antiterrorism and Effective Death Penalty Act of 1996.

recorded interview with Petitioner in the Violent Crimes Interview Room at Police Headquarters. (Doc. 10, Exh. C, app. 1.) After being advised of his <u>Miranda</u> rights, Petitioner invoked his right to have an attorney present; Detective Faulkner did not ask Petitioner any more questions, and left the interview room. (Doc. 10, Exh. C, app. 1.)

A short time later, Detective Faulkner learned that Petitioner's parents were at the police station. (Doc. 10, Exh. C, app. 1.) Detective Faulkner went to the lobby to meet with them, and Petitioner's stepfather asked if they could speak with Petitioner "before he was booked." (Doc. 10, Exh. C, app. 1.) Detective Faulkner then asked Petitioner if he wanted to speak with his parents, and he indicated that he did. (Doc. 10, Exh. C, app. 1.) Detective Faulker escorted the parents into the interview room. (Doc. 10, Exh. C, app. 1.) Detective Faulkner let the DVD continue to record and "watched and listened to their meeting in the monitoring room." (Doc. 10, Exh. C, app. 1.) Portions of the conversation between Petitioner and his parents included the following:

1:27:20 – [Petitioner] – I'm so sorry, I had to.

1:28:15 – [Stepfather] – What provoked this son?

[Petitioner] – I had enough.

1:28:28 – [Stepfather] – Did you go there with the intention to do that or did he provoke it after you got there?

[Petitioner] – No, I walked right in.

1:30:08 – [Mother] – Did he know it was coming, did he even know what you were going to do?

[Petitioner] – I have no idea. He was playing poker or something, laying down on the floor.

1:36:18 – [Mother] – Did you bring them the gun?

[Petitioner] – It was in the trunk.

1:36:34 – [Petitioner] – I don't know what kept me from not doing her too.

1:36:50 – [Stepfather] – Was she in the room when this all happened, what did she say?

[Petitioner] – Nods head in the affirmative. I can't remember, I don't know.

1:38:20 – [Mother] – Did you go in to kill him or just shoot him or just scare him, what do you think?

[Petitioner] – As soon as she told me that, I drove around for two minutes and went straight to the house. I opened the door and walked right in, walked into the bedroom where they were at and saw them laying there on the floor, and that was it.

1:39:12 – [Petitioner] – After it was done, she had talked me into giving [our son] back to her. Like ok, I'm done. I gotta go.

1:39:56 – [Petitioner] – I just messed up my entire life.

1:46:37 – [Mother] – I wish you would have gone to anger management or something.

[Petitioner] – I was thinking about that too.

(Doc. 10, Exh. C, app. 1.)

Relying on  Maine v. Moulton, 474 U.S. 159 (1985), Petitioner argues that the conduct of the officers in recording his conversation with his parents was a surreptitious use of his parents as agents for the State and thus, any admissions made during that conversation were unconstitutional. Petitioner states that the officers knew or should have known that his conversation with his parents was reasonably likely to produce an incriminating response. Petitioner asserts that the trial court's failure to apply the holdings of Moulton is contrary to or an unreasonable application of Federal law.

In Moulton, the Court held that the Sixth Amendment right to counsel is violated if the state knowingly circumvents the right to counsel by a confrontation between the accused and a state agent. See id. at 176. Specifically, the Supreme Court found that the state violated the Sixth Amendment right of a defendant when it arranged to record conversations between the defendant and a codefendant who was operating as an undercover agent for the state. See id. at 176-77. The codefendant had agreed to cooperate with the prosecution, and the state placed a wire on him so he could record a face-to-face meeting between him and the defendant. See id.

Petitioner's reliance on the Supreme Court's Sixth Amendment decision in Moulton is misplaced. Pursuant to the Sixth and Fourteenth Amendments, a state criminal defendant has the right to assistance of counsel. See Gideon v. Wainwright, 372 U.S. 335, 339-43

(1963). This right "is triggered at or after the time that judicial proceedings have been initiated ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Fellers v. United States, 540 U.S. 519, 523 (2004) (internal quotation marks omitted). The right also attaches at "critical stages" where there is a risk that the absence of counsel might undermine a defendant's right to a fair trial. See United States v. Wade, 388 U.S. 218, 228 (1967); see also Beaty v. Stewart, 303 F.3d 975, 991-92 (9th Cir. 2002) ("A 'critical stage' is a trial-like confrontation in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice." (internal quotation marks, brackets, and citations omitted)). Critical stages do not include, however, events "that t[ake] place long before the commencement of any prosecution whatever." Kirby v. Illinois, 406 U.S. 682, 690 (1972).

Here, the conversation at issue between Petitioner and his parents occurred on July 17, 2005, within a few hours of the shooting. (Doc. 10, Exh. C, app. 1; Doc. 1, Exh. E, app. A at 11) Within a few hours of the conclusion of that conversation, Petitioner was booked into jail on charges of First Degree Murder, Aggravated Assault, and Burglary in the First Degree. (Id.) A criminal complaint was filed on July 20, 2005. (Doc. 10, Exh. A at 3.) The Indictment was returned against Petitioner on July 27, 2005. (Doc. 10, Exh. A.) Because Petitioner had not yet been formally charged when he spoke to his parents, he did not have a Sixth Amendment right to counsel and, as such, the Court's Sixth Amendment precedent does not apply. See Kirby, 406 U.S. at 688-90 ("The initiation of judicial criminal proceedings is far from a mere formalism. ... It is this point, therefore, that marks the commencement of the criminal prosecutions to which alone the explicit guarantees of the Sixth Amendment are applicable." (internal quotation marks omitted)); see also United States v. Hayes, 231 F.3d 663, 667 (9th Cir. 2000) (en banc) ("Because no formal charges were pending against [the defendant] at the time of the surreptitious taping, it follows that ... [the defendant's] Sixth Amendment rights were not violated.").

The Fifth Amendment, however, provides that an individual cannot "be compelled in any criminal case to be a witness against himself." In Miranda v. Arizona, 384 U.S. 436, 444

(1966), the Court held that protection of the privilege against self-incrimination during pretrial questioning requires the application of special procedural safeguards, specifically that prior to any questioning, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney ... ." Once an accused has expressed a desire "to deal with the police only through counsel," he is not subject to further interrogation by police until counsel has been made available, or unless the accused initiates further exchanges with the police. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

The Court clarified the directives of Miranda in Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980), where it concluded that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." The Court also noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id.

Applying Petitioner's Sixth Amendment reasoning as set forth in Moulton to the Fifth Amendment context in the instant matter, Petitioner still cannot show that his parents were acting as agents of the police or that the police interrogated him. See Innis, 446 U.S. at 300 ("[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Initially, Petitioner fails to demonstrate that his parents were used as either witting or unwitting agents of the police to elicit incriminating statements. First, there was no clear motive for the police to enlist Petitioner's parents' assistance, given that Lisa was an eyewitness to the murder and gave a statement to the police on the day of the murder, telling them that Petitioner shot Timothy as she and he were lying on the bedroom floor. (Doc. 10, Exh. C, app. 1.) The gun used to commit the offenses was found in Petitioner's

trunk, wrapped in a blue shirt just as Lisa had described to the police. (Doc. 10, Exh. C, app. 1.) Second, Petitioner's mother and stepfather voluntarily went to the police station and requested to speak to Petitioner, and Petitioner indicated in response that he wanted to speak to them. Specifically, the record shows that after Detective Faulkner left the Violent Crimes Interview Room at Police Headquarters, he learned that Petitioner's parents were at the police station. (Doc. 10, Exh. C, app. 1.) Detective Faulkner went to the lobby to meet with them, and Petitioner's stepfather asked if they could speak with Petitioner "before he was booked." (Doc. 10, Exh. C, app. 1.) Detective Faulkner then asked Petitioner if he wanted to speak with his parents, and Petitioner indicated that he did. (Doc. 10, Exh. C, app. 1.) Detective Faulker escorted the parents into the interview room. (Doc. 10, Exh. C, app. 1.)

Not only has Petitioner failed to demonstrate that his parents were acting as agents of the police, Petitioner also cannot show that the police interrogated him within the meaning of <u>Miranda</u>. The Supreme Court has explained that "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Innis</u>, 446 U.S. at 300.

Under certain circumstances, questioning by third parties may result in the "functional equivalent" of police interrogation. For instance, in <u>Arizona v. Mauro</u>, 481 U.S. 520 (1987), the defendant argued that he was subject to interrogation when the police allowed him to speak with his wife in the presence of a police officer. <u>See</u> <u>id.</u> at 527. The Supreme Court concluded that Mauro's conversation with his wife did not constitute interrogation because Mauro "was not subjected to compelling influences, psychological ploys, or direct questioning," and there was no evidence that "the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements." <u>Id.</u> at 528-29. Although the officers were aware that Mauro might incriminate himself during the conversation with his wife, the Court concluded that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." <u>Id.</u> at 529.

Petitioner appears to argue that he was subjected to the "functional equivalent" of interrogation when he confessed to his parents because the police "knew or should have

known that Petitioner's conversation with his parents was reasonably likely to produce an incriminating response." In Mauro, the Court stressed that the purpose of Miranda is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." 481 U.S. at 529-530. For coercion to be present, the suspect must perceive that the pressure to speak is emanating from the police. See id. Here, there is no evidence that Petitioner felt coerced by police conduct. (Doc. 10, Exh. C, app. 1.) This is also not a case in which private questioning was given the stamp of official authority, see, e.g., Estelle v. Smith, 451 U.S. 454, 467 (1981) (questioning by court-appointed competency psychiatrist implicated defendant's Miranda rights), nor in which government officials forced a suspect to answer a third party's questions. See, e.g., Wilson v. O'Leary, 895 F.2d 378, 380-81 (7th Cir. 1990) (holding Miranda applicable where sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate him). See also United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990) (suspect in custody was not interrogated when aunt, who was employed by the police department but acted as a private citizen when conversing with her nephew, urged him to tell police what he knew about a crime); Snethen v. Nix, 885 F.2d 456, 457 (8th Cir. 1989) (suspect in custody was not interrogated when he confessed after a conversation with his mother, who had told police before the conversation that "if [my son] did this, he will tell me"); Endress v. Dugger, 880 F.2d 1244, 1248-49 (9th Cir. 1989) (detective who was close friend of defendant and visited defendant to inquire on his well-being rather than at direction of officer connected with investigation did not subject defendant to "functional equivalent of interrogation," and thus, statements made by defendant to detective were not obtained in violation of Miranda ).

Rather, the entire conversation between Petitioner and his parents appears to be that of a son attempting to justify his conduct to some degree and apologizing for his actions, and distraught parents asking "what" happened. (Doc. 10, Exh. C, app. 1.) Petitioner's parents questioned Petitioner on their own initiative and with no scripting or encouragement from the police, and the police never instructed Petitioner that he had to speak to his parents.

(Doc. 10, Exh. C, app. 1.)   The record further illustrates that Petitioner initiated the conversation and willingly responded to his parents' questions about the incident in question. (Doc. 10, Exh. C, app. 1.)

Petitioner, however, asserts that the surreptitious recording of his conversation with his parents was unconstitutional.  Although Petitioner has not raised the issue, the Court first notes that under the circumstances of this case, Petitioner had no reasonable expectation of privacy.  See, e.g., Lanza v. New York, 370 U.S. 139, 143-44 (1962) (rejecting the notion that the visiting room of a public jail is a constitutionally protected area where "official surveillance has traditionally been the order of the day"); United States v. Van Poyck, 77 F.3d 285, 290-91 (9th Cir. 1996) (pretrial detainee did not have a subjective or reasonable expectation of privacy in telephone calls from jail at Metropolitan Detention Center); Siripongs v. Calderon, 35 F.3d 1308, 1319-20 (9th Cir. 1994) (Officer was within constitutional bounds where he recorded an arrestee's telephone conversation in the police station.  The arrestee had the conversation within a few feet of an officer.  Even though he conducted the conversation in Thai, the court found that the arrestee "could not reasonably expect any privacy during his conversation").  As previously indicated, the conversation between Petitioner and his parents took place in the actively monitored Violent Crimes Interview Room at Police Headquarters where Petitioner's statements were initially being recorded with Detective Faulkner and where various other detectives undoubtedly came and went.  (Doc. 10, Exh. C, app. 1.)  Further, the record fails to contain any references to representations or inquiries made as to privacy or confidentiality.  There is simply no indication that Petitioner was lulled into believing that he and his parents could speak in private or that he was lured into a false sense of security by misrepresentations made by the police.  Similarly, although it may be deeply disconcerting to parents who unwittingly provide evidence incriminating their child,  there exists no clearly established federal law holding that Petitioner had a right to confidential communications with his parents.  See United States v. Penn, 647 F.2d 876, 885 (9th Cir. 1980) ("There is no judicially or legislatively recognized general 'family' privilege ... .").  As such, Petitioner could not have

had a subjective or reasonable expectation of privacy during the conversation with his parents in this instance.

Furthermore, statements are not considered to be coerced or involuntary as violative of Miranda, merely because the speakers are unaware that their statements are being recorded. See Williams v. Nelson, 457 F.2d 376, 377 (9th Cir. 1972) (concluding that the police recording of a defendant's conversation with his co-defendant – without the knowledge of either, by means of a concealed microphone – while the two were alone in an interrogation room did "not constitute coercion"); see also Illinois v. Perkins, 496 U.S. 292, 298 (1990) (holding that an incarcerated suspect who made incriminating statements to an undercover law enforcement officer posing as a fellow inmate was not subjected to a custodial interrogation); Siripongs, 35 F.3d at 319-20 (surreptitious recording of telephone call in jail by corrections officer standing nearby with a hidden recorder did not violate inmate's rights because his statements were not uttered in response to any interrogation).

In sum, the Court finds that Petitioner "was not subjected to compelling influences, psychological ploys, or direct questioning," from police to properly be considered the functional equivalent of a police interrogation, and there is no evidence that Petitioner's parents acted as agents for the police for the purpose of eliciting incriminating statements. Therefore, the Court concludes that the state court's denial of this claim was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law.

**B.    Ground Two**

Petitioner contends in Ground Two that he was denied the right to effective assistance of counsel. Specifically, he alleges that he was denied effective assistance when his counsel "failed to file a motion to suppress his surreptitiously recorded confession, waited over three weeks from appointment until initially meeting with his client, waited over ten months to get Petitioner professionally evaluated, and portrayed an unwillingness to proceed to trial but rather was prepared only to settle the case through a plea agreement."

The two-prong test for establishing ineffective assistance of counsel was established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail

on an ineffective assistance claim, a convicted defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 687-88.

Regarding the performance prong, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. See id. at 690. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bonin v. Calderon, 59 F.3d 815, 833 (9th Cir. 1995) (quoting Strickland, 466 U.S. at 689). Moreover, review of counsel's performance under Strickland is "extremely limited": "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), judgment rev'd on other grounds, 525 U.S. 141 (1998). Thus, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

If the prisoner is able to satisfy the performance prong, he must also establish prejudice. See id. at 691-92; see also Smith v. Robbins, 528 U.S. 259, 285 (2000) (burden is on defendant to show prejudice). To establish prejudice, a prisoner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. See Robbins, 528 U.S. at 286 n.14. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, which we expect will often be so, that course should be followed." Id. (quoting Strickland, 466 U.S. at 697).

The two-prong test set forth in Strickland also applies to challenges to guilty pleas based on ineffective assistance of counsel. See Hill v. Lockhart, 474 U.S. 52, 58 (1985). A defendant who pleads guilty based on the advice of counsel may attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel fell below the level of competence demanded of attorneys in criminal cases. See id. at 56. To satisfy the second prong of the Strickland test, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

In reviewing a state court's resolution of an ineffective assistance of counsel claim, the Court considers whether the state court applied Strickland unreasonably:

> For [a petitioner] to succeed [on an ineffective assistance of counsel claim], ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citations omitted); see also Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.") (citations omitted).

Having reviewed the record, the Court finds that the state court did not unreasonably apply Strickland. The Court will recommend that Petitioner's claim as asserted in Ground Two be denied.

### 1. **Failed to file a motion to suppress his surreptitiously recorded confession**

Petitioner first asserts that he was denied effective assistance of counsel when counsel failed to file a motion to suppress his surreptitiously recorded conversation with his parents.

Petitioner claims that counsel did not move to have his recorded conversation with his parents suppressed despite a strong argument that the State's procurement of the taped confession was a violation of his <u>Miranda</u> rights.

Although such conduct can constitute deficient performance, there was no prejudice in this instance. An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. <u>See</u> <u>Jones v. Smith</u>, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing <u>Boag v. Raines</u>, 769 F.2d 1341, 1344 (9th Cir. 1985)). "To show prejudice under *Strickland* from failure to file a motion, a defendant must show that (1) had his counsel filed the motion, it is reasonable that the state court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999); <u>see also</u> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 373-75 (1986) (so stating with respect to failure to file a motion to suppress on Fourth Amendment grounds). Here, Petitioner refers to counsel's failure to file a motion to suppress alleging a violation of his <u>Miranda</u> rights when the police recorded his conversation with his parents. As discussed in connection with Ground One, however, there was no such error. Since any such motion would have been denied, there was no prejudice to Petitioner.

## 2. <u>Waited over three weeks until initially meeting with Petitioner</u>

Next, Petitioner argues that he was denied effective assistance of counsel when counsel did not contact Petitioner until over three weeks after he had been assigned to Petitioner's case. Petitioner makes a conclusory attack on the resulting prejudice of defense counsel's strategy alleging that "[t]his [delay] had an impact on important aspects of the defense such as getting defendant professionally and timely evaluated, and investigating certain evidence and procedures particular to this case."

Again, while in some instances such conduct can constitute deficient performance, there was no prejudice. Petitioner has failed to demonstrate that had counsel met with him three weeks earlier "he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59.

### 3. **Waited over ten months to get Petitioner professionally evaluated**

Petitioner contends that he was denied effective assistance of counsel when counsel did not arrange a professional evaluation of Petitioner until over ten months after the incident at issue happened. Petitioner claims that "[e]stablishing the accused's state of mind at the time of an alleged first degree murder is an essential element of the prosecution's case in a criminal proceeding, thus also becoming an important tool for the defense. Consequently, waiting ten months to have [Petitioner] professionally evaluated diluted the chances that the evaluation would be an accurate representation of Petitioner's state of mind at the time of the murder."

Petitioner has, once again, failed to establish any prejudice resulting from the timing of his psychological evaluation. See Hill, 474 U.S. at 59. In any event, the record demonstrates that Petitioner was evaluated more than four months prior to entering his plea of guilty, giving defense counsel Petitioner's relevant psychological information well in advance of any plea being entered by Petitioner. (Doc. 1, Exh. E, attach. C.)

### 4. **Portrayed an unwillingness to proceed to trial**

Lastly, Petitioner claims that he was denied effective assistance of counsel when his counsel portrayed an unwillingness to proceed to trial but rather was prepared only to settle the case through a plea agreement. Petitioner states that he was under severe time-pressure with respect to making a decision on the plea agreement and argues that counsel's eagerness to settle the case through a plea agreement coupled with counsel's assertions that the plea was Petitioner's only chance to get out of jail, undoubtedly prejudiced Petitioner in his decision to take the plea.

Petitioner makes a conclusory attack on defense counsel's strategy. The Court, however, fails to find deficient performance. Here, the evidence against Petitioner was overwhelming. Not only was there eyewitness testimony of the murder, but the gun used to kill the victim was found in the trunk of Petitioner's vehicle, wrapped in the blue shirt just as Lisa had described to the police. (Doc. 1, Exh. E, attach. A at 7-9.) Other admissible evidence which would have been used against Petitioner was the fact he voluntarily turned

himself in to the police and the, subsequent, admissions made to his parents soon after the murder had occurred.  (Doc. 10, Exh. C, app. 1.)

The weight of the evidence against Petitioner, coupled with the very real concern that if convicted, Petitioner may have been sentenced to a natural life term with no hope of ever being released from prison, prevents Petitioner from establishing that counsel's representation was objectively unreasonable in advising Petitioner to enter a plea in this case. See Coleman, 150 F.3d at 1113; Bonin, 59 F.3d at 833.

**C.    Ground Three**

In Ground Three, Petitioner's claims that his guilty plea was unlawfully induced. Petitioner states that he "pled guilty to felony murder, mere hours after telling the judge he did not fully understand the plea, while at the same time working under time-pressure, and continued pressure from [defense counsel] to enter into the plea agreement ... ."

The record, however, establishes that Petitioner voluntarily entered into the plea agreement with the State, and that the State extended its regular plea deadlines in order to allow Petitioner additional time to make a decision regarding the plea.  (Doc. 1, Exh. G, attach. D, E.)  For example, during the trial management conference held on October 11, 2006, the court, counsel and Petitioner addressed various provisions of the proposed plea agreement.  (Doc. 1, Exh. G, attach. D.)  The court explained that the principal inducement for the plea was that if convicted at trial, Petitioner would be eligible for a natural life sentence and/or consecutive sentences, but the proposed plea agreement took those sentences "off the table."  (Doc. 1, Exh. G, attach. D at 6.)  When asked if he understood the various terms of the agreement, Petitioner stated, "[n]ot one hundred percent, sir."  (Doc. 1, Exh. G, attach. D at 6.)  The following discussion then took place:

THE COURT: What is it that you do not understand, sir?

THE DEFENDANT: I was not aware of the felony murder side of it, and I don't understand what that exactly entails.

THE COURT: It means that the State can allege and prove alternative theories to the jury.  One is that the alleged murder was premeditated, or if not premeditated, it was committed in the course of committing another predicate felony.  Another felony was being committed, and in the course of conducting

- 18 -

that felony, a murder took place. So the State has the option to prove either of those or both theories to the jury, and the jury can then choose whether they believe beyond a reasonable doubt that you committed either a first degree murder, a felony murder, or both. They can do a combination of that.

So you have been charged with both, and the State can argue those alternative theories to the jury at the same time. Either one of those. Premeditated and felony murder are both first degree murder. That's the distinction.

State want to add anything to that explanation?

[THE PROSECUTOR]: Just that under our theory under the felony murder is the burglary, so that basically we would argue as part of our theory, that in addition to premeditation, that the defendant entered the residential structure with a weapon with the intent to commit a felony therein, the murder and the aggravated assault, and that in doing so, cause the death of another person in this case, Tim Zaragoza. So that, obviously, would not require any proof of premeditation.

(Doc. 1, Exh. G, attach. D at 7-8.) The prosecutor then informed the court that the plea offer expired that day, that office policies had already been extended beyond normal limits in Petitioner's case, and that there would be no other offer. (Doc. 1, Exh. G, attach. D at 8.)

Regarding the issue of felony murder, later in the proceedings defense counsel informed the court:

[DEFENSE COUNSEL]: Judge, if I could just put one last thing on the record. My client, Mr. Tower, indicated he wasn't aware of the felony – that they may proceed under felony murder. For the defense's purposes, we treat the mental state in this case pretty much the same, because the State is going to have to show the intent to enter, and so his mental state is really what's been at issue, and that's how we have treated it all along. So I just wanted to make that for the record.

(Doc. 1, Exh. G, attach. D at 11.)

As to the expiration of the plea offer, the prosecutor informed the court that the victim's family had traveled to the court proceedings, and that they wanted to be present for any change of plea entered by Petitioner. (Doc. 1, Exh. G, attach. D at 8, 11.) The prosecutor pointed out that defense counsel had her cell phone number, she was available if Petitioner wanted to enter a plea later that day, but that after that day there would be no other offer. (Doc. 1, Exh. G, attach. D at 11.)

In addition, during the change of plea proceeding, Petitioner was asked by the court whether he had signed and initialed each paragraph of the plea agreement, to which Petitioner

replied, "[y]es, I did, of my own free will." (Doc. 1, Exh. G, attach. E at 3-4.) When specifically questioned if he "had an opportunity to discuss with [his] attorney everything that's in [the plea] agreement before [he] did that," Petitioner responded, "[y]es, I did." (Doc. 1, Exh. G, attach. E at 3-4.) When questioned if he understood the stipulations in the plea agreement and whether the sentencing provisions had been explained to him, Petitioner answered in the affirmative, and the following discussion ensued:

> THE COURT: Other than what is contained in writing in this plea agreement, are there any additional promises that were made to you by anyone to induce you to enter into this agreement?
>
> THE DEFENDANT: None whatsoever.
>
> THE COURT: Anyone threaten you, sir, or force you to enter into this agreement?
>
> THE DEFENDANT: No, sir.
>
> THE COURT: Mr. Tower, I need you to again affirm to me that you are doing this voluntarily and of your own free will.
>
> THE DEFENDANT: Yes.

(Doc. 1, Exh. G, attach. E at 6.) The court verified that Petitioner understood that by pleading guilty he was waiving his rights, including the right to confront and cross-examine witnesses, to present his own evidence, to have his witnesses testify on his behalf, to testify in his own defense, and the right to remain silent. (Doc. 1, Exh. G, attach. E at 6-8.) After confirming Petitioner's understanding of the rights he was waiving, the court found Petitioner's plea was "knowingly, intelligently, and voluntarily made." (Doc. 1, Exh. G, attach. E at 10.)

The foregoing illustrates that Petitioner voluntarily and knowingly entered into the plea agreement with the State, and that there was no coercion or duress prompting him to do so. Petitioner confirmed he wished to enter a plea agreement, acknowledged there were no promises made other than those contained in the agreement to induce his plea, and affirmed he had discussed all of the terms of the agreement with his counsel prior to entering his plea. Furthermore, Petitioner specifically stated he was entering the plea voluntarily and of his own free will, without threats or force being used to coerce his plea.

Thus, the Court finds that the court's determination that Petitioner failed to present a colorable claim for relief on the ground his plea was unlawfully induced was neither contrary to, nor an unreasonable application of, clearly established federal law.

**D.      Ground Four**

Petitioner asserts in Ground Four that the trial court's denial of his motion for a 30-day continuance during the course of the trial management conference so that Petitioner could "assess the plea agreement," and investigate the possibility of having another attorney "look at the case," was a denial of his right to due process of law.

During the course of the trial management conference, the court addressed the scheduling of the trial, and indicated to counsel that the court could begin trial in five days, on October 16, 2006, or alternatively, on "the 18th or the 19th" of October. (Doc. 1, Exh. G, attach. D at 3-4.) Defense counsel then informed the court:

> [DEFENSE COUNSEL]: Judge, from our perspective, that would be fine. We have no objection to that. However, as I made the Court aware at the bench with [the prosecutor], the family has approached me, and because it is a very emotional case for the family, as well as to Mr. Tower, and the stakes are very high to everybody involved, it is their desire, as I made the Court aware, that they want to get a little extra time, possibly thirty days, so that they can have the opportunity to assess the plea agreement, as well as maybe have another lawyer look at the case.
>
> I have assured them that a continuance may or may not happen, but I am going to make that request to the Court at this time.

(Doc. 1, Exh. G, attach. D at 4.) The court then responded:

> Well, Mr. Tower and his family can have another attorney look at this at any point in time. If we are talking about a new attorney coming in cold to this case, I wouldn't expect that any attorney would be able to be prepared for trial in thirty days. If we are talking about just looking and considering the plea, that's another matter, and they can do that at any point in time.

(Doc. 1, Exh. G, attach. D at 4-5.) Then, the court inquired as to whether a plea had been offered to Petitioner, and when it would expire; the prosecutor informed the parties that the plea offer would expire that day, and there would be no other offer. (Doc. 1, Exh. G, attach. D at 5, 8, 11.) After hearing the status of the plea, the court stated:

> [Defense counsel], Mr. Tower, you understand the plea expires today, and the offering of a plea and the terms of a plea are within the sole discretion of the prosecutor's office. I do not have the authority to change that. Your attorney

1  certainly does not have the authority to change that. If the State says the plea
2  expires today, it expires today, and there is nothing that the Court or [defense
   counsel] can do to change that. If the State changes it, they can, but that's
3  completely in their discretion.

4  Given all of that information, [defense counsel], I am not inclined to continue
   this matter for thirty days. I think I will – in fact, I'd like to set it now for trial,
5  for jury selection the afternoon of the 18th, and then ask you to call my staff
   on the 16th to firm that up. I mean, there is a possibility it could get bumped
6  up until the 19th, but I would like to plan on selecting the jury on the afternoon
   of the 18th.

7  (Doc. 1, Exh. G, attach. D at 9.) Defense counsel then requested that the offer be left open

8  until 5:00 p.m. that day, so that he could discuss matters with Petitioner and his family.

9  (Doc. 1, Exh. G, attach. D at 9-10.)

10       "The matter of a continuance is traditionally within the discretion of the trial judge,

11  and it is not every denial of a request for more time that violates due process even if the party

12  fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic

13  insistence upon expeditiousness in the face of a justifiable request for delay can render the

14  right to defend with counsel an empty formality. There are no mechanical tests for deciding

15  when a denial of a continuance is so arbitrary as to violate due process. The answer must be

16  found in the circumstances present in every case, particularly in the reasons presented to the

17  trial judge at the time the request is denied." Ungar v. Sarafite, 376 U.S. 575, 589 (1964)

18  (internal citations omitted); see Morris v. Slappy, 461 U.S. 1, 11-12 (1983) ("broad discretion

19  must be granted trial courts on matters of continuances; only an unreasoning and arbitrary

20  'insistence upon expeditiousness in the face of a justifiable request for delay' violates the

21  right to assistance of counsel"). Additionally, even if the continuance was improperly

22  denied, habeas relief is not available unless there is a showing of actual prejudice to

23  petitioner's defense resulting from the refusal to grant a continuance. See Gallego v.

24  McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).

25       In considering whether the denial of a continuance implicating a defendant's right to

26  counsel is an abuse of discretion, the Ninth Circuit has applied these factors: (1) whether the

27  continuance would inconvenience witnesses, the court, counsel, or the litigants; (2) whether

28  other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4)

1  whether the delay is the defendant's fault; and (5) whether a denial would prejudice the

2  defendant.  See United States v. Mejia, 69 F.3d 309, 314 n.5 (9th Cir. 1995) (citing United

3  States v. Robinson, 967 F.2d 287, 291 (9th Cir. 1992)); see also United States v. Garrett, 179

4  F.3d 1143, 1145-47 (9th Cir.1999) (en banc).

5      Here, the trial court did not act arbitrarily in denying the motion for a continuance.

6  The application of the factors identified by the Ninth Circuit to Petitioner's claim leads to the

7  conclusion that this was not a case of a judge with a "myopic insistence upon expeditiousness

8  in the face of a justifiable request for delay."  Ungar, 376 U.S. at 589.  As indicated, during

9  the course of the trial management conference, counsel for Petitioner requested a 30-day

10  continuance "so that [Petitioner's family] can have the opportunity to assess the plea

11  agreement, as well as maybe have another lawyer look at the case."  Prior to ruling on the

12  issue, the court ascertained the status of plea negotiations, and pointed out that if a

13  continuance were granted, Petitioner would still forfeit his opportunity to enter into a plea

14  agreement.  (Doc. 1, Exh. G, attach. D at 9.)  If Petitioner had been granted a continuance,

15  not only would the plea agreement have been withdrawn, but it is unreasonable to believe the

16  continuance would have served a useful purpose since the weight of the evidence against

17  Petitioner was overwhelming and, as set forth by the court, "[i]f we are talking about a new

18  attorney coming in cold to this case, I wouldn't expect that any attorney would be able to be

19  prepared for trial in thirty days."  (Doc. 1, Exh. G, attach. D at 4-5.)

20      On these facts, the denial of Petitioner's request for a continuance was neither

21  arbitrary, nor fundamentally unfair.  Consequently, denial of post-conviction relief was

22  neither contrary to, nor an unreasonable application of, clearly established federal law.

23  ### CONCLUSION

24      Having determined that the claims set forth in Petitioner's habeas petition fail on the

25  merits, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus (Doc.

26  1) be denied and dismissed with prejudice.

27

28

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

**DATED** this 13th day of July, 2010.

*Michelle H. Burns*

Michelle H. Burns
United States Magistrate Judge

- 24 -